770 F.2d 165
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CINCINNATI ETA, OHIO; CINCINNATI ZOO, PETITIONERS,
v.
NANCY COOMER; SECRETARY OF LABOR; UNITED STATES DEPARTMENT
OF LABOR, RESPONDENTS.
 NO. 84-3361
 United States Court of Appeals, Sixth Circuit.
 7/16/85
 
 Dept. of Labor
 REMANDED
 On Petition for Review of an Order of the Secretary of Labor
 Before: KENNEDY and WELLFORD, Circuit Judges, and WEICK, Senior Circuit Judge.
 KENNEDY, Circuit Judge.
 
 
 1
 This is an appeal from a final decision of the Secretary of Labor disallowing costs of $111,659.69 incurred by the City of Cincinnati as prime sponsor of employment programs under the Comprehensive Employment and Training Act (CETA), 29 U.S.C.A. Sec. 801, et seq. (1975).[1]
 
 I.
 
 2
 In 1978, respondent Coomer filed a complaint with the Employment and Training Administration (ETA), alleging, inter alia, that ineligible participants were being employed in certain of Cincinnati's CETA programs. Following an investigation, the City's Grant Officer determined that 11 program participants were ineligible,[2] and issued a Notice of Initial Determination and Opportunity for Informal Resolution on March 26, 1981, disallowing all costs associated with the ineligible participants.
 
 
 3
 The City objected to the Grant Officer's initial determination, solely on the basis that liability for payments to ineligible participants had been shifted to OBES pursuant to 29 C.F.R. Sec. 99.43(c),[3] by virtue of a Cost Reimbursement Contract between the City and the Ohio Bureau of Employment Services (OBES), executed January 9, 1978, and covering the period from October 1, 1977, through September 30, 1978, inclusive. Section One of the contract specified that OBES would perform the services described in the attached Statement of Work. Part A of the Statement of Work, headed 'PROGRAM GOALS,' stated that OBES 'will provide intake, selection and referral, monitoring and evaluation . . . for CETA . . . eligible applicants to PSE jobs developed by the City of Cincinnati.' Part B, headed 'ELIGIBILITY CRITERIA,' delineated the eligibility requirements for applicants to Title II & VI jobs. See note 3 supra. Part C, headed 'TYPES OF SERVICES AND ACTIVITIES,' provided, in pertinent part:
 
 
 4
 1. OBES/UI will be responsible for identifying claimants who have been receiving unemployment compensation for (15) weeks of the last 20 weeks for determining their interest in PSE jobs and screening for the lower living standard income level criteria.
 
 
 5
 2. ES will ascertain from the eligible applicant interest [sic] in the CETA VI PSE Program whether he/she is registered. If the applicant is registered, the ES Office will forward an up-dated ES-511 to the 'Central Intake Unit'. If the applicant is not registered, the ES Office will call the applicant into the office to complete an ES-511.
 
 
 6
 3. The WIN Program will be responsible for referring eligible, interested WIN recipients to the 'Central Intake Unit'. Along with each referral, the WIN Office will send an ES-511.
 
 
 7
 4. CETA subgrantees and the City of Cincinnati will send their interested referrals to the Parkway ES Office or to the Cincinnati Claims North Office for eligibility determination.
 
 
 8
 5. ES will primarily be responsible for determining eligibility of recently separated veterans interested in CETA VI PSE jobs.
 
 
 9
 6. All local offices and ES are to post a notice to inform all individuals of the availability of CETA VI PSE opportunities. Local office will be responsible for eligibility determinations of 'walk-ins'. . . .
 
 
 10
 On April 21, 1981, the Grant Officer issued his final determination, disallowing all costs associated with the ineligible participants. He focused on p C.1. of the Statement of Work, concluding:
 
 
 11
 By stating that OBES/UI will identify claimants who have been receiving unemployment compensation for 15 of the last 20 weeks, it would seem that an agreement for verification of the receipt of unemployment compensation for the requisite period may have existed . . .. This would constitute verification of the eligibility criteria in 99.42(a)(1)(i) in part.
 
 
 12
 Four individuals were found ineligible, based in whole or in part on the lack of the qualifying period of unemployment . . .. None of the four were shown as unemployment compensation recipients or exhaustees; but the OBES agreement did not provide for verification of the length of unemployment, where persons were not unemployment compensation recipients.
 
 
 13
 .............................................................
 
 
 14
 ...................
 
 
 15
 * * *
 
 
 16
 Thus, it is agreed that the Prime Sponsor would not be liable for costs resulting from reliance on OBES verification of the eligibility requirements pertinent to employment compensation status, cited in 99.42(a)(1)(i), if the arrangements [sic] incorporated in its agreement with OBES for such verification were described and approved in its Title VI grant.
 
 
 17
 The Grant Officer made no explicit finding as to whether the contract was described in the City's Title VI grant, presumably because even if it was, the City did not demonstrate that it had relied on an erroneous OBES verification with respect to the four individuals ineligible on the period of employment criteria.
 
 
 18
 The City requested a hearing before an ALJ to contest the Grant Officer's final determination. In its prehearing statement, the City stated that the sufficiency of its contract with OBES was a legal issue, which could be decided by the ALJ on the existing record and supplemental briefs. In its brief, filed October 29, 1981, the City reasserted its position that its contract with OBES was sufficient to protect it from liability under 29 C.F.R. Sec. 99.43(c). It argued that the Grant Officer erred in focusing solely on p C.1. of the Statement of Work to the exclusion of paragraphs C.4.-C.6. It also argued that '[a]dmittedly, the Appellant may have omitted setting forth such an arrangement in its Title VI Grant,' but that the existence of the agreement complied with 'the spirit, if not the letter of the law,' and that to impose liability on the City 'because of a technicality . . . is patently unfair and flies in the face of the spirit of the regulatory section in question.'
 
 
 19
 The Grant Officer's Brief to the ALJ, filed June 30, 1983, reiterated his interpretation of the contract, based upon p C.1., concluding that since the agreement in question did not specifically indicate that OBES was to determine the residence, income level and length of unemployment of applicants, it 'does not qualify under Section 99.43(c)(1) or (2) and, therefore, is not sufficient to protect the prime sponsor from liability as contemplated by section 99.43(c)(3).' The Grant Officer contended in the alternative that the agreement failed to meet the requirements of Sec. 99.43(c)(3) because it had not been 'described and approved in the Title VI Grant' (emphasis in original).
 
 
 20
 The ALJ upheld the determination of the Grant Officer, concluding that, although the City-OBES contract was broad enough to cover most or all potential participants, it did not require that OBES determine all necessary elements of eligibility, as prescribed by 29 C.F.R. Sec. 99.42(a)(1), nor was it described in the City's approved grant, as required by Sec. 99.43(c)(3). The ALJ reasoned that the contract was designed to limit the responsibility of OBES in such a way that, if both the City and OBES succeeded in their intentions, neither could be held responsible for the erroneous determinations at issue.
 
 
 21
 The City petitioned the Secretary for reversal of the ALJ's decision, contending that 'review of additional documentation . . . and the contract establishes a contractual relationship which satisfies 29 C.F.R. Section 99.43.' The City also objected to the amount of the ALJ's repayment order, contending, pursuant to 29 C.F.R. Sec. 99.43(b), that it should not be liable for certain wages paid ineligible participants. The Secretary did not respond to the City's petition, and, by virtue of 20 C.F.R. Sec. 676.91(f), the ALJ's decision became the final decision of the Secretary, from which the City appeals. The City contends on appeal that the Secretary erred in concluding that its contract with OBES did not satisfy the requirements of Sec. 99.43(c); and that, even if the contract was technically insufficient to satisfy the requirements of the regulation, the case should be remanded to the ALJ to consider the equities of requiring the City to pay all disallowed expenses, and for recomputation of the amount disallowed in light of Sec. 99.43(b).
 
 II.
 
 22
 The interpretation of a written document such as a contract is a question of law to be determined by the courts. While courts may approve and adopt an agency's contruction of such a document, they are not bound to do so. Danks v. Fields, 696 F.2d 572, 575 (8th Cir. 1982); Federal-Mogul Corp. v. N.L.R.B., 566 F.2d 1245, 1256 (5th Cir. 1978) (citing cases).[4] Greater deference may be due administrative agencies 'even on matters of law like the meaning of contracts, . . . where the understanding of the documents involved is enhanced by technical knowledge of industry conditions and practices,' Columbia Gas Transmission Corp. v. F.P.C., 530 F.2d 1056, 1059 (D.C. Cir. 1976), or 'where underlying issues of fact or policy are involved.' North Atlantic Westbound Freight Association v. Federal Maritime Commission, 397 F.2d 683, 685 (D.C. Cir. 1968); see also Western Transportation Co. v. Wilson & Co., 682 F.2d 1227, 1230-31 (7th Cir. 1982). In the instant case, however, the Secretary's decision, although concerned with furthering the policy of insuring that CETA funds are recoverable if not expended in accordance with the requirements of the Act, was based purely on its construction of the language of the City-OBES contract, not on the exercise of judgment regarding policy or technical knowledge within the agency's area of expertise. See Danks, supra.
 
 
 23
 By far the most natural and reasonable interpretation of the involved agreement is that it provides that OBES assumes full responsibility for verifying all Title II & VI eligibility criteria, as specified in Part B of the Statement of Work. The Secretary's reliance on p C.1., as specifically limiting the eligibility determination obligation assumed by OBES, is a strained and artificial reading of the contract. That paragraph makes no reference to eligibility determination. It refers to the identification of 'claimants who have been receiving unemployment compensation for fifteen (15) weeks of the last 20 weeks for determining their interest in PSE jobs' (emphasis added). As such, it pertains to identification and referral of persons interested in CETA VI PSE jobs, not verification of eligibility.[5] Paragraphs 4, 5 and 6 refer explicitly to determination of eligibility, without qualification. The logical reading of these paragraphs is that determination of eligibility by OBES was to be guided by the eligibility criteria fully set forth in Part B.
 
 III.
 
 24
 The Secretary also found, however, that the agreement in question was not legally effective to shift liability because it was not 'described in an approved grant,' as provided in subsection (c)(3). The ALJ stated that the latter point 'appears to be conceded' by the City. There is no indication from the record that the ALJ's conclusion was based upon an examination of the grant in question, or that the grant document was ever part of the administrative record.[6] Nor is the City's Title VI grant contained in the record before us.
 
 
 25
 Eligible applicants for Title VI grants must include in their grant applications a Comprehensive Title VI Plan. 29 C.F.R. Sec. 99.12(c). This Plan must in turn include a Narrative Description of the Title VI Program. 29 C.F.R. Sec. 99.14(a). The Narrative Description must '[d]escribe . . . the method which will be used to verify [low-income AFDC recipients and long-term unemployed] persons' eligibility for the program.' 29 C.F.R. Sec. 99.14(b)(3)(v). However, Sec. 99.43(c) does not require that a verification agreement be 'described in an approved grant,' prior to initial approval of the grant, to be effective. By reference, Title VI grant modification procedures follow those set forth in 29 C.F.R. Sec. 95.21. 29 C.F.R. Sec. 99.21. That regulation requires prior regional office approval of significant changes in the systems and procedures set forth in the narrative description of the plan. 29 C.F.R. Sec. 95.21(a)(2)(ii). Thus, approved modifications become part of the approved grant.
 
 
 26
 The City asserts in its brief to this Court that '[t]he involved grant, Grant No. 39-5066-60, states on the first page '[A] contract is now being written with the local SESA for immediate implementation of this program.' Narrative Title VI, p. 1.' It then contends that correspondence between the City and ETA Associate Regional Administrator Lewis F. Nicolini, proffered by the City for the first time with its petition to the Secretary to reverse the decision of the ALJ, demonstrates that its contract once executed was approved as a modification to its grant. This correspondence consists of two letters. The first, dated December 9, 1977, is designated as 'Appendix J,' and acknowledges receipt of proposed Modification #14. It states that '[p]rior to execution of this modification, additional information or clarification is needed.' There follow references to specific modifications under headings denoting specific parts of the grant. Under the heading, 'Narrative', the letter states: 'See detailed comments on your OJT proposal in Attachment I.' It is clear from Attachment I that this proposal is or includes the contract at issue. The Secretary assumes as much in arguing that this correspondence supports the ALJ's opinion, emphasizing the recommendation in the attached comments that 'the contract should spell out OBES responsibility for certifying eligibility,' and the statement, 'I cannot reiterate too strongly the need to redraft this contract to clearly specify the statement of work . . ..'
 
 
 27
 However, the second letter, dated March 3, 1978, and designated as 'Attachment K,' states: 'Enclosed is an executed copy of Modification No. 14 to your Title VI Grant No. 39-5066-60.' It then refers to the various changes made in the proposed modification prior to execution, including the statement: 'Your commitment (on page 2 of the narrative) to implement new internal controls to prevent unauthorized, inaccurate or incomplete enrollment counts in the program is most welcome.'
 
 
 28
 The Secretary contends that these letters were never presented to the ALJ and hence are not properly before and should not be considered by this Court. See 20 C.F.R. Sec. 676.90(f); Commonwealth of Massachusetts v. United States Department of Labor, 683 F.2d 568, 570 (1st Cir. 1982). In the 'hearing' before the ALJ,[7] the Secretary, as 'proponent' of the Grant Officer's Final Determination, bore the burden of presenting a prima facie case in support of that 'order.' 5 U.S.C. Sec. 556(d); State of Maine v. United States Department of Labor, 669 F.2d 827, 829-30 & n.5 (1st Cir. 1982). The Grant Officer made no specific finding in his Final Determination that the arrangement with OBES was not described in the City's approved grant, nor is there any indication that the ALJ did anything more than rely on the equivocal 'concession' in the City's prehearing brief in making this finding. See note 6 supra and accompanying text. This is not sufficient to satisfy the Secretary's burden of production. Whether or not the grant as approved and modifications thereto were ever actually included in the administrative record, they are so fundamental to the question of whether the arrangement at issue was described in the City's approved grant, that this question cannot be answered without them.[8]
 
 IV.
 
 29
 This Court, 'for good cause shown, may remand the case to the Secretary to take further evidence, and the Secretary may thereupon make new or modified findings of fact and may modify his previous action, and shall certify to the court the record of the further proceedings.' 29 U.S.C.A. Sec. 819(b) (emphasis added); see Quechan Indian Tribe v. United States Department of Labor, 723 F.2d 733, 736 (9th Cir. 1984). In light of the discussion above, this case must be remanded to the Secretary on the question of whether the City-OBES agreement, as interpreted by this Court, was described in the City's approved grant. On remand, the Secretary is directed to consider the approved grant, the correspondence discussed above relating to Modification No. 14, and any other evidence that the Secretary considers pertinent. See Bethlehem Steel Corp. v. EPA, 638 F.2d 994, 1000 (7th Cir. 1980) ('It is clear that this court has the legal authority and power to order the supplementation of the record where 'anything material to any party is omitted from the record,' Fed.R.App.Pro. 16(b), or where the supplementation is necessary for effective judicial review of the agency's actions.' (citing cases)). Since this question, if answered in the affirmative, would most likely resolve this litigation,[9] and since the record of the proceedings must otherwise be certified to this Court, it is unnecessary at this time to address the remainder of appellants' contentions.
 
 
 30
 The Secretary's finding that the City is liable for disallowed costs associated with the single employee who was paid but for whom there was no evidence that he had performed any work, see note 2 supra, is affirmed.
 
 
 31
 Although the City may fairly be characterized as the 'prevailing party' on this appeal, its failure to provide this Court with an adequate record for the purposes of review, apart from its confused presentation of its case to the Secretary, has needlessly complicated and prolonged this case. Therefore, costs on appeal will be assessed against appellants. See Wilkerson v. Johnson, 699 F.2d 325, 330 (6th Cir. 1983).
 
 
 32
 It is so ordered.
 
 
 
 [1]
 CETA has been repealed and replaced by the Job Training Partnership Act, Pub. L. No. 97-300, 96 Stat. 1357 (1982) (codified at 29 U.S.C. Sec. 1501, et seq.). Pending CETA administrative or judicial proceedings are not affected. 29 U.S.C. Sec. 1591(e)
 
 
 [2]
 He disallowed costs associated with a twelfth participant enrolled at the Cincinnati Zoo because there was no record of that participant's employment. The ALJ concluded that even if the City-OBES agreement were valid, it would not shift liability for this participant. The City did not and does not contest the factual findings of the Grant Officer in his Initial Determination, incorporated in his Final Determination and adopted by the Secretary, and conceded liability during oral argument for the disallowed costs associated with this program participant
 
 
 [3]
 That regulation provides, in pertinent part:
 (c) In order to protect their liability, prime sponsors are encouraged to develop arangements and procedures for the verification of participants as follows:
 (1) Arrangements, including cooperative agreements, with SESA's [State employment security agencies] for the verification of individuals whose applications indicate that they qualify pursuant to paragraphs (i), (ii), and (iii) of Sec. 99.42(a)(1); and
 * * *
 (3) To the extent that there are arrangements pursuant to paragraphs (c)(1) and (2) of this section and these arrangements are described in an approved grant, the prime sponsor shall not be responsible for verifying those eligibility requirements covered in those arrangements, nor shall it be liable for any costs resulting from its reliance on such arrangements.
 The eligibility requirements of 29 C.F.R. Sec. 99.42(a)(1)(i)-(iii), referenced in Sec. 99.43(c)(1), read in pertinent part as follows:
 (a) The following criteria shall be used by prime sponsors in determining eligibility . . ..
 (1) An eligible person must . . . be a member of a family which has a total family income . . . at or below 70 per centum of the lower living standard income level, as defined in Sec. 94.4(nnn), and must meet the residency requirements of Sec. 99.38 of this part, and must be a person. [sic]
 (i) Who, during 15 of the 20 weeks immediately prior to application, has been unemployed . . . or has received unemployment compensation: Provided, That during the 20-week period, the eligible person shall not have obtained permanent, unsubsidized, full-time employment; or
 (ii) Who, during 15 of the 20 weeks immediately prior to application, has had a combination of weeks of unemployment and weeks of receiving unemployment compensation as described in paragraph (a)(1)(i) of this section: Provided, [as above]; or
 (iii) Who is unemployed . . . at the time of application and is an exhaustee . . .
 
 
 [4]
 The Secretary cites N.L.R.B. v. World Evangelism, Inc., 656 F.2d 1349, 1355 (9th Cir. 1981), for the proposition that an agency finding as to the existence of an agreement is a finding of fact governed by the substantial evidence standard of review. Whether parties have agreed to a contract is a question of fact, but the cited case does not contradict the well-established rule that the contruction of a contract is a question of law. The Secretary does not contend that OBES and the City did not execute the agreement in question
 
 
 [5]
 It may be that p C.1. was erroneously associated with verification of eligibility criteria because it is the first paragraph under the heading, 'TYPES OF SERVICES AND ACTIVITIES,' immediately following Part B. Logically, however, applicants must be found before their eligibility is verified. Paragraphs 1-3 all refer to steps prior or collateral to determination of eligibility. See Letter from Lewis F. Nicolini, ETA Associate Regional Administrator, Attachment I at 4 (December 9, 1977) ('the contract should spell out OBES responsibility for certifying eligibility . . . and the related functions of establishing and maintaining an adequate pool of applicants'). Paragraphs 4-6 then assign responsibility for eligibility determinations to various offices of OBES depending on the type of applicant. This construction is supported by p C.6., the first sentence of which provides for the posting of notices in all local offices and ES to inform all individuals of the availability of CETA VI PSE opportunities, and the second sentence of which specifies that such offices shall be responsible for eligibility determinations of interested 'walk-ins'
 
 
 [6]
 The ALJ states in his decision that 'the Administrative File (Tabs A-J, inclusive) was received in evidence and administrative notice will be taken of the materials attached to the City's prehearing statement . . . and to its brief . . ..' The City's approved grant is not one of these items
 
 
 [7]
 The ALJ's decision was rendered on the basis of the record and written submissions of the parties, without an oral hearing
 
 
 [8]
 We also note that since the finding that the arrangement was not described in the City's approved grant was made for the first time in the ALJ's decision, the City had some justification for not introducing the proffered correspondence until it petitioned the Secretary to reverse the ALJ. Cf. Commonwealth of Massachusetts v. United States Dep't of Labor, supra. In that case, the ALJ directed counsel for the Commonwealth to attach to its post-hearing brief a copy of an agency 'regional letter' on which the Commonwealth relied. Counsel failed to do so. After the ALJ rendered his decision, counsel submitted the letter to the Secretary. The Secretary apparently disregarded the submission, because no action was taken and the ALJ's decision became the final decision of the Secretary. The court held 'that it was within the Secretary's discretion not to countenance such eleventh hour tactics.' 683 F.2d at 570
 
 
 [9]
 The ALJ also stated that since the contract covered only the period October 1, 1977, through September 30, 1978, it could not cover any eligibility determinations made before or after that period. He also observed that since the contract was not executed until January 8, 1978, 'it is therefore difficult to see how the contract could be relied upon to protect the City from liability for payments to any ineligible participants it may have hired in the period for October 1, 1977-January 7, 1978.' A similar argument might be made respecting the period between January 8, when the contract was formally executed, and March 3, when it apparently was approved as a modification to the City's approved grant
 There is no indication in the record before this Court that any of the eligibility determinations of the 11 program participants found to be ineligible, were made outside the term of the contract. As to the dates the contract was formally executed and approved, there is no indication in the record that OBES did not actually perform throughout the period covered by the contract. Moreover, it is noteworthy that on page 2 of the attachment to the first Nicolini letter, it states that 'the period of performance of the contract can include a retroactive start date.' This statement is not contrary to anything in either Sec. 99.43, respecting verification agreements, or Sec. 95.21, respecting grant modifications. The Secretary may make further findings on remand on these points if he deems it to be necessary.